

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN T. MALTAS, Personal :
Representative of the Estate of :
Richard B. Maltas, Deceased, :
    Plaintiff :
                      :

    v. :     Civil No. AMD 00-3671

                      :
MICHAEL L. MALTAS and MARY :
ELLEN MALTAS, :
    Defendants :

             ...o0o...

```
_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

          APR 2 6 2002

          AT BALTIMORE
   CLERK U.S. DISTRICT COURT,
    DISTRICT OF MARYLAND
BY                        DEPUTY
```

MEMORANDUM

This diversity case requires the court's scrutiny of an unfortunate intra family dispute. The issues surround the propriety of the actions of one of seven siblings who greatly benefitted himself and his wife, to the exclusion of his brothers and sisters, from the receipt of $100,000 provided to him by his now-deceased father. The father, Richard B. Maltas (referred to herein as "Ben"), instituted the case in December 2000, while he was a domiciliary of Alaska, to recover an unspecified portion of the $100,000. After Ben's death in April 2001, the personal representative of Ben's estate, his son John T. Maltas ("plaintiff" or "Tom"), was substituted as plaintiff.

Tom contends that his brother Michael and Michael's wife, Mary Ellen (collectively "defendants" or "Michael and Mary Ellen"), who reside in Maryland, are liable for constructive fraud in respect to the money they received from Ben, or, alternatively, that Michael and Mary Ellen were unjustly enriched and should be ordered to return some portion of the funds to Ben's estate, principally via the imposition of a constructive trust

upon defendants' Maryland residence.

Now pending is defendants' motion for summary judgment, on the grounds of limitations and on the merits, as to all of plaintiff's claims. Discovery has been completed. I have given careful attention to the parties' memoranda and exhibits and a hearing is not needed. Local R. 105.6. For the reasons explained below, summary judgment shall be granted in favor of defendants.

I.

Pursuant to Fed. R. Civ. P. 56 (c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248-49. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse

party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matushita Elec. Indust. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

## II.

The following account of material facts is set forth in the light most favorable to plaintiff, the nonmovant. Ben was born in Connecticut on February 15, 1918, the son of a Greek immigrant father and French immigrant mother. *Aff. of John T. Maltas*, Attach. A (handwritten biography by Ben, dated March 28, 2000) (hereinafter *Tom Aff.*). When Ben was a youngster, he was hit in the head by a rock or a brick. *Id.* Ben's academic performance faltered as a result of that incident. *Id.*; *see also Dep. of Michael L. Maltas* at 83-85 (hereinafter *Michael Dep.*). Ben completed no more than the tenth grade of high school. *Tom Aff.*, Attach. A.; *Dep. of John T. Maltas* at 49. When he was eighteen, Ben entered the National Guard, *Tom Aff.*, Attach. B, and he later enlisted in the Army. He was honorably discharged from the Army in 1940. *Id.* Ben then joined the Marine Corps in

1945 and was honorably discharged in 1946. *Tom Aff.*, Attach. C.

On February 18, 1942, Ben married Virginia Tallon. They resided in Connecticut and raised seven children: Richard Brian ("Brian"); Virginia; Tom (the plaintiff personal representative and an attorney); George; Michael (who is, together with his wife, a defendant); Jeanne; and Patrice. Unexpectedly, Mrs. Maltas suffered a stroke and died a few days later in May 1991. For months after his wife's death, Ben grieved and his family thought that he appeared to be out of sorts and depressed. *Dep. of Marilyn Maltas* at 8-9; *Tom Aff.* ¶ 8.

Ben was not knowledgeable about financial and business affairs. *Aff. of Richard Brian Maltas* ¶ 12. Rather, Mrs. Maltas had handled the financial affairs of the household before she died. *Id.; Michael's Dep.* at 80-81. Brian had to teach Ben how to write out checks after Mrs. Maltas died. *Dep. of Richard Brian Maltas* at 9; *Tom Aff.* ¶ 11. Brian gave the following deposition testimony regarding the role that he and Michael (who were seemingly the only two siblings who resided near Ben in Connecticut) played in Ben's life after the death of Mrs. Maltas:

> Q.    . . . I want to focus on the 1991 time frame, after your mother's death. You have testified earlier that you and your brother Michael had had discussions about your need to take some role with respect to your father's future.
>
> A.    Yeah.
>
> Q.    Do you recall anything that Michael said about what he viewed as his role as being with respect to your father?

A.    I can't phrase anything exactly, except that we were both agreeing with
      that issue that there were not a lot of alternatives out there and it was
      going to be our responsibility. I wasn't like – it was just conversation
      back and forth saying, you know, it's going to fall on us, and we would
      say back and forth –

Q.    Would it be correct to say that Michael agreed with you that the two of
      you would take some responsibilities for your father's future at that
      point?

Q.    Yes, positively.

*Dep. of Richard Brian Maltas* at 36-37.

About three or four weeks after his wife's death, Ben left Connecticut and went to

stay in Alaska with Tom for several weeks. Tom observed during this period that his father

was extremely depressed. *Aff. of John T. Maltas* ¶¶ 5, 8. While Ben was in Alaska, and

apparently with Ben's knowledge and permission, Brian and Michael arranged for their

parents' house to be sold. *Aff. of Richard Brian Maltas* ¶ 4. The house was sold in

September 1991 for $202,500.00. *Id.* ¶ 5. After the mortgage on the property was satisfied

and real estate commissions and legal fees were paid, the net proceeds from the sale were

$171,115.00. *Id.* The house had been Ben's primary asset and the proceeds from the sale

essentially equaled Ben's net worth. *Id.* During this time, Brian and Michael had a series

of discussions about their father's future; it was clear that Ben did not want to live alone.

*Id.* ¶ 6. When Ben returned from Alaska, he lived in Connecticut with Brian and his wife

Marilyn for a short period. *Id.*

Prior to Mrs. Maltas's death, Michael and Mary Ellen had discussed with his parents

the idea of buying a duplex residence that would permit the four of them (with the three children of Michael and Mary Ellen) to live together. *Dep. of Mary Ellen Maltas* at 7-8. Michael and Mary Ellen had never owned their own home. After Mrs. Maltas's death, Brian and Michael discussed a plan whereby Ben would provide the down payment for a house (from the proceeds of the sale of the former marital home) in which Ben would live with Michael, Mary Ellen and their children. Mary Ellen and Marilyn searched for a suitable property. *Aff. of Richard Brian Maltas* ¶ 8. Mary Ellen described the family situation during this period among Ben, Michael, herself, Brian, and Brian's wife Marilyn as follows: "We were very close, there were no boundaries in any of our families." *Dep. of Mary Ellen Maltas* at 13. Eventually, Mary Ellen and Marilyn found a house located on Sylvan Drive in Ridgefield, Connecticut ("the Connecticut residence"), not far from the residence of Brian and Marilyn. *Aff. of Richard Brian Maltas* ¶ 8.

The purchase price of the Connecticut residence was $212,500. *Id.* ¶ 9; *Dep. of Mary Ellen Maltas* at 20. Ben provided $100,000 from the proceeds of the sale of his former marital home to enable Michael and Mary Ellen to purchase the Connecticut residence. *Dep. of Mary Ellen Maltas* at 20. The down payment was approximately $78,000; the remainder of the $100,000, about $22,000, was to be used to build an addition to the Connecticut residence, thereby affording Ben access to more private space. *Aff. of Richard Brian Maltas* ¶ 11; *Dep. of Mary Ellen Maltas* at 20.

In November 1991, Ben, Michael, Mary Ellen and the three children moved into the

Connecticut residence. Ben lived in the basement of the residence, an area of the house that also contained the laundry room (located in Ben's kitchen area) and an entrance to the garage. *Id.* The proposed addition was never built. The money that had been intended for use to pay for the addition was used instead for household expenses such as the mortgage and utility bills, especially the costs of heating the Connecticut residence. *Dep. of Mary Ellen Maltas* at 20-21. It was Mary Ellen's understanding that Ben knew that the money was being used in this manner, *id.* at 21-22, and Michael was forthright on deposition in explaining that the monthly mortgage payment, which far exceeded the rent he and Mary Ellen had been accustomed to paying, and related expenses of home ownership, put a strain on the household budget.

In January 1992, two months after the closing on the Connecticut residence, Ben and Brian contacted Brian's attorney, James Mannion, Esq. ("Mannion"), to prepare a suitable document that would spell out the obligations of the parties regarding Ben's right to live in the Connecticut residence and the potential repayment, as discussed below, of some portion of the money Ben had provided to Michael and Mary Ellen. Brian and his wife Marilyn had apparently engaged in a similar transaction with one of Marilyn's parents.

Eventually, after one or more meetings among Brian, Marilyn, Michael, Mary Ellen and Ben, Mannion drafted a quit claim deed, to be executed by Michael and Mary Ellen, which gave Ben a life estate in the Connecticut residence. *Defs.' Ex.* 1 (1992 quit claim deed). Michael and Mary Ellen executed the deed in January 1992 in the law office operated

-7-

by Mannion, and Mannion promptly recorded the deed in the land records as a lien against the Connecticut residence.

The 1992 quit claim deed is a complicated document, containing obvious but minor typographical errors, that would tax the interpretive powers of the most astute real estate legal practitioner. It provides for a number of different scenarios or eventualities, and specifically includes hypothetical examples of possible future events. First, the life estate would terminate upon the Ben's death. Second, the life estate would cease upon Ben being absent from the residence for a consecutive six month period, as shown by an affidavit recorded by Michael and Mary Ellen. (Apparently, this provision was inserted, in part at least, in contemplation of Ben requiring nursing home care, the effect thereon of the federal Medicaid Act, and potential difficulties of obtaining a release of the lien of the quit claim deed without a voluntary act by Ben.)

The other two contingencies contemplated a decision by Michael and Mary Ellen either to move to a nearby replacement home, or to a replacement home some distance away. Mannion endeavored to anticipate the consequences to Ben of those events, and provided in the quit claim deed for a conditional repayment of a portion of the funds provided by Ben to Michael and Mary Ellen. Specifically, as to a move to a nearby replacement home, the quit claim deed recites that if Michael and Mary Ellen sell the residence and move within a 75 mile radius of the "geographical boundaries of the Town of Ridgefield, Connecticut," then Ben would be obligated to release his lien, but an identical life estate would attach to

-8-

the new residence of Michael and Mary Ellen. *Id.* The release of the lien in this instance

would be effective either when Ben signed a specific release, or when Michael and Mary

Ellen provide an appropriate affidavit. *Id.*

A relocation by Michael and Mary Ellen to a new home more than 75 miles from

Ridgefield would result in a far more complicated resolution. The deed recites that if

Michael and Mary Ellen should sell the Connecticut residence and move to a replacement

residence beyond a radius of 75 miles, Ben would have the option of accepting a life estate

in the new residence, or, if Ben decided not to move into the replacement residence, then

Michael and Mary Ellen would sign a promissory note and, potentially, at least, repay a

portion of the funds provided by Ben. The maximum amount of the promissory note would

be $75,000 (not $100,000), but the actual amount would hinge on several factors, including

the amount of time that Ben actually resided in the Connecticut residence before Michael

and Mary Ellen moved out of the area. Specifically, there would be a $1000 per month

reduction in the pay back amount.

The purpose of the 1992 quit claim deed was to recognize Ben's rights in the

Connecticut residence and to provide for the possibility that Michael and Mary Ellen could

move from Connecticut and that Ben could require nursing care. *Aff. of Richard Brian

Maltas* ¶ 13. Although Mannion had provided legal services to Michael and Mary Ellen in

connection with the actual purchase of the Connecticut residence, as to the transaction

involving the 1992 quit claim deed, Mannion admitted-- and it is clear as a matter of law--

that he represented all of the parties to the transaction-- Ben, Michael, and Mary Ellen.

Mannion either did not charge a fee for his services, or he may have deemed the services

paid for by Brian, to whom he regularly provided legal services for which he was paid. *Dep.*

*of James Mannion* at 4-6.

Mannion testified on deposition that Ben, Brian, and Michael came to his office and

they discussed what a life estate was, what would happen if Ben had to move to a nursing

home, what would happen if Ben decided to move, and what would happen if Michael

decided to move. *Id.* at 7-8. According to Mannion, the purpose of the deed was to protect

all parties involved. *Id.* at 8. Moreover, Mannion noted that Ben wanted to protect his

interests in the event that something happened to Michael and Mary Ellen. *Id.* at 8.

Mannion recalled discussing the terms of the quit claim deed. *Id.* at 9-10.

In the course of the meetings with Mannion, Brian and his wife, Marilyn, specifically

discussed the fact that $75,000 (and not $100,000) was the maximum potential repayment

to Ben. Brian testified as follows:

> There was one thing which kind of annoyed my wife, which was when
> [Mannion] got up and left the room, and Dad, Mike, Mary Ellen, Marilyn and
> myself were here, my father leaned over and said to Mike, what about the
> other $25,000, because this paper only says 75,000? And Mike said to my
> father, don't worry about it, Pop, that's between you and me. We will take
> care of it later.
>     Now, I had no problem with that statement. My wife did. She says to
> me, Brian, its $25,000. I says, well, look it, they're going to put the room on,
> don't worry about it. There's complete trust. There's no reason for me to say,
> well, Mike, why don't you write up another piece of paper that you are going
> to build a room that would cost approximately $25,000. That stung her. She
> talked to me as soon as we left the office about it. I remember him saying it,

but I said, so what? What do you have to worry about?

*Dep. of Richard Brian Maltas* at 42-43.

By 1993, mortgage rates had fallen and Michael and Mary Ellen decided to refinance the Connecticut residence. They learned, after they had been approved for refinancing, that they were unable to do so because of the existence of the 1992 quit claim deed; it was essentially a cloud on their title to the Connecticut residence. Michael, Mary Ellen, and Ben, who knew of and apparently supported the refinancing plan, went back to Mannion for assistance.

Mannion drafted a second quit claim deed ("the 1993 quit claim deed"). *Dep. of James Mannion* at 14. Mannion explained to Ben that signing the 1993 quit claim deed would terminate the life estate and remove the protections Ben enjoyed under the 1992 quit claim deed. *Id.* at 14. Ben assured Mannion that he understood the effects of the 1993 quit claim deed. *Id.* Accordingly, Ben signed the 1993 quit claim deed in Mannion's office in November 1993. The 1993 quit claim deed reconveyed all of Ben's right, title and interest in the Connecticut residence to Michael and Mary Ellen. *Defs.' Ex.* 2. The 1993 quit claim deed was properly witnessed and notarized. *Id.* Upon the recordation of the 1993 quit claim deed, Michael and Mary Ellen were able to complete the refinancing. Michael and Mary Ellen received $10,381.11 in cash back from the refinancing. *Dep. of Mary Ellen Maltas* at 51-52. None of this money was given to Ben. *Id.*

Mannion's recollection of the signing of the 1993 quit claim deed and his role in its

execution is as follows, in part:

> A. My recollection was that I was sitting across the table from them. Ben was on my left, and to his left was Michael, and I went through the discourses I described earlier with Ben, asked do you understand what you are giving up. This is a release. You are giving up your rights to do this and to do that and the other thing. And as I remember, Ben, he raised his hand, yeah, Michael and I have talked; it's all taken care of.
>
> Q. Do you recall if Michael said anything during that meeting?
>
> A. I don't.
>
> Q. Do you recall if Michael had any reaction to Ben's statement that he and Michael had discussed this and it was taken care of?
>
> A. I don't recall a specific verbal thing. He might have shaken, nodded his head in assent, but I was not upset or unduly warned [sic] by his actions during that discussion . . . .
>
>> Ben appeared to me to be lucid and understanding and responsive to my explanations of what he was doing.

*Id.* at 16-17; 28. Mannion knew of no evidence whatsoever that Ben did not understand him, or that Ben was under any disability or condition that would prevent Ben from understanding what he was doing when he signed the 1993 quit claim deed. *Id.* at 24-25.

In July 1994, Ben decided to accompany his son, Tom, who was returning home to Alaska through Connecticut from a trip to Europe. Ben changed his driver's license and voter's registration shortly after he arrived in Alaska. *Dep. of John Thomas Maltas* at 33. Thereafter, except for occasional visits in the years between 1994 and 2001, Ben did not return to Connecticut or to Maryland, where Michael and Mary Ellen later moved. Nevertheless, Michael and Mary Ellen were under the belief that Ben's stay in Alaska was

only temporary; he could return to live with them at any moment. *Dep. of Michael Maltas* at 37. Indeed, a letter (signed "Love, Dad") from Ben to Michael in October 1996 expressed Ben's (seemingly tentative) intention to return to Connecticut in the spring of 1997 and to move in again with Michael and Mary Ellen. *Defs.' Ex.* 10. Ben never actually discussed the idea with Michael and Mary Ellen, but Michael testified that they were "ready for him." *Dep. of Michael Maltas* at 89.

Meanwhile, in September 1996, Michael accepted employment in the Washington, D.C., area. Thereafter, for nine months, Michael lived in leased residences in the Washington area while Mary Ellen and their children remained in Connecticut. The Connecticut residence was then leased starting in June 1997; Michael and Mary Ellen (with their children) leased a home in the Washington area. When Michael decided to renew his employment contract in the Washington area in 1999, Michael and Mary Ellen put the Connecticut residence on the market. The closing of the sale of the Connecticut residence occurred in July 1999. *Dep. of Mary Ellen Maltas*, Ex. 4. The house sold for $249,000 and Michael and Mary Ellen received $87,036.70 after expenses were paid. *Id.* Michael and Mary Ellen used $60,440.47 from the proceeds of the Connecticut residence to purchase a residence in Maryland. *Dep. of Mary Ellen Maltas* at 70-72.

Neither Ben nor Michael and Mary Ellen ever told Brian or Tom about the 1993 quit claim deed. Apparently, after the Connecticut residence was sold in July 1999, Marilyn (Brian's wife) conducted a search of the Ridgefield land records and discovered that the

1992 quit claim deed had been superceded by the 1993 quit claim deed. Thereafter, at the urging of Tom and Brian, Ben asked Michael and Mary Ellen to return a portion of the money that Ben had given to them in 1991. It appears that the amount that should be returned was not clearly stated. *Dep. of John Thomas Maltas* at 54; *Dep. of Richard Brian Maltas* at 26; *Dep. of Michael Maltas* at 54. At some point, Michael and Mary Ellen made it clear to Brian and Tom that they did not believe that they had a legally-enforceable obligation to pay Ben any money. *Dep. of Marilyn Maltas* at14.

In the meantime during 1999, Tom took Ben to consult with an Alaska attorney, LeRoy Eugene DeVeaux, Esq., about the matter. *Aff. of LeRoy E. DeVeaux* ¶ 3. DeVeaux met alone with Ben. He found Ben to be hard of hearing and difficult to communicate with. *Id.* ¶ 4. DeVeaux formed the opinion from their discussion regarding the two deeds that Ben "had no concept of the meaning or significance of the documents." *Id.* "Ben was extremely surprised and agitated when [DeVeaux] explained to him that the 1993 Quit Claim Deed purported to release any rights he may have had in the Ridgefield, Connecticut property that was the subject of the 1992 quit claim deed." *Id.* ¶ 5.

Apparently in consultation with DeVeaux and Tom, Ben proposed that Michael repay $25,000 over a period of nine or ten years, at a certain interest rate, and that he be given a life estate in the Maryland residence. *Dep. of Michael Maltas* at 54. Indisputably, Ben's proposals and demands changed from time-to-time: Marilyn testified that Ben spoke to her several times about what he wanted back; "in one conversation, he said he wanted $35,500

. . . [in another conversation] [h]e wanted 30,000, and then 5,500 for a car loan." *Dep. of*

*Marilyn Maltas* at12.

In any event, in September 1999, Michael and Mary Ellen paid $5000 to Ben,

ostensibly, solely because Michael had promised to give Ben some money. Michael testified

as follows:

> Q. Did there come a time when you became aware that your father was contending that he – you owned [sic] him money as a consequence of the hundred thousand dollars he had given you in 1991?
>
> A. To the extent that he told me in the summer of '99 that he wanted some money, he would like to know if he could get some money back.
>
> Q. Prior to that, had your father ever discussed the issue of his getting money back from you.
>
> A. No.
>
> Q. Tell me what happened in 1999.
>
> A. Without going through all the logistics, we had a conversation in Annapolis, Maryland, we were downtown. He told me that time that he had decided to permanently reside in Alaska, asked me if he could – he knew that [the Connecticut residence] was on the market and asked if he could get some money back.
>
> Q. And what did you say?
>
> A. Okay.
>
> Q. At that time, did you discuss any amount of money?
>
> A. No.

*Dep. of Michael Maltas* at 51-52.

Notwithstanding the $5000 payment in September 1999, Ben wrote to Michael in January 2000 expressing his distress over the money problems that he was having with Michael. *Dep. of Michael Maltas*. Ex. 9. The letter relates that Ben is upset that Michael has not refunded him some portion of the $100,000 originally given to Michael by Ben. *Id.* The letter appears to mention only the 1992 quit claim deed. The letter states: "It was written down in the lawyer officer that the house if you or I moved out . . . . Move 75 miles I would get money back. Remember Mike? That when you had a Quit Claim made and I sign [sic] it. Not a very nice thing to do to your father. I was not in good shape at that time." *Id.* The letter also asks Michael why he is holding onto the money that was not used for the down payment on the Connecticut residence. The letter further recites:

> This when the use of that money for 8 years is worth more than $100,000 according to your [brother] John T. Maltas. And I your father only lived with you in the Ridgefield House about 30 months. Why did you use all that money to buy the house in Maryland. . . . I told you I was not coming to live with you when I saw you last June 99.

*Id.* On December 19, 2000, Ben filed this case against Michael and Mary Ellen.

III.

Before addressing the parties' arguments on limitations and on the merits, it is necessary to discuss briefly several preliminary issues.

A.

The parties agree that the substantive law of Connecticut applies in this case. *Cf. Silvestri v. General Motors Corp.*, 210 F.3d 240, 243 (4th Cir. 2000). As explained *supra*,

-16-

the present case involves alleged injuries suffered by Ben, who was living in Alaska at the time, relating to a transfer of funds and the purchase of a residence in Connecticut. The court applies the choice-of-law principles of the state in which it sits, in this case Maryland. *Id.* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). The Supreme Court in *Klaxon Co. v. Stentor Electric Mfg.* Co., 313 U.S. 487, 496 (1941), relying upon *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), determined that, in a diversity action in federal district court, the court is to apply the conflicts law of the forum state. Maryland courts apply the rule of *lex loci delicti* in tort cases. *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 230 (2000). *Lex loci delicti* commands that "when an accident occurs in another state, substantive rights of the parties, even though they are domiciled in Maryland, are to be determined by the law of the state in which the alleged tort took place." *Id.* at 230 (internal quotation marks omitted).

## B.

Plaintiff argues that Maryland's statute of limitations, as a procedural rule under the rule of *lex fori*, applies in the present case. Defendants argue, without conviction, that Connecticut's statute of limitations applies because Connecticut's substantive law applies; defendants do not contend that Connecticut's statute of limitations applies on the ground that it is in any way "substantive."

It is clear that Maryland's statute of limitations applies in the present case. Maryland courts apply Maryland's statute of limitations to claims that arise under the substantive laws

of other states. *Fischer v. Viacom International, Inc.*, 115 F. Supp. 2d 535, 538-39 (D. Md. 2000) ("Maryland courts generally adhere to the doctrine of *lex loci delicti*, and will apply their own procedural rules, including statutes of limitations, to claims that arise under the substantive law of other states." (citing *Pottratz v. Davis*, 588 F. Supp. 949, 952 (D. Md. 1984))); *Sokolowki v. Flanzer*, 769 F.2d 975, 978 (1985); *Turner v. Yamaha Motor Corp., U.S.A.*, 591 A.2d 886, 887 (Md. Ct. Spec. App. 1991)(citing *Mandru v. Ashby*, 71 A. 312 (Md. 1908)).

"There is an exception where the substantive law of a foreign state applies, but the foreign statute of limitations constitutes a condition precedent to the right to maintain the action. In such cases, the period of limitations is part of the substantive right of action." *Turner*, 591 A.2d at 887 (citing *Slate v. Zitomer*, 341 A.2d 789 (Md.), *cert. denied sub. nom*, *Gasperich v. Church*, 423 U.S. 1076 (1975)); *Sokolowski*, 769 F.2d at 978 ("In instances where a foreign statute of limitations extinguishes the underlying right and not merely the remedy, the foreign statute of limitations is considered substantive and must be applied by the forum court." (citing *Directors of Georgetown College v. Madden*, 505 F. Supp. 557, 571 (D. Md. 1980), *aff'd in part and appeal dismissed in party*, 660 F.2d 91 (4th Cir. 1981); *Slate*, 341 A.2d 789)). The present case does not involve such a statute of limitations and defendants do not argue as much. *Cf. Sokolowski*, 769 F.2d at 979-81. *See Defs.' Mot. to Dismiss and for Summ. J.* at 7-8 (arguing that the following Connecticut statutes of limitations apply: CON. GEN. STAT. § 52-577 and CON. GEN. STAT. § 52-576). Accordingly,

the Maryland statute of limitations applies.

C.

A state dead man's statute may be applicable in a diversity action in federal court pursuant to Federal Rule of Evidence 601, which states:

> Every person is competent to be a witness except as otherwise provided in these rules. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law.

FED. R. EVID. 601. Ben died on April 10, 2001, after the present case was filed. By an order dated August 16, 2001, Tom, as the Personal Representative of Ben's estate, was substituted as the plaintiff. Thus, because the action is being prosecuted by the estate of a deceased person, it seems the issue arises whether the dead man's statute of Maryland or Connecticut applies in the present case. If the Maryland statute applies, the substitution of a personal representative after the case was filed but before trial is of no consequence. *See Montgomery County v. Herlihy*, 575 A.2d 785, 789 (Md. Ct. Spec. App.)("The purpose of the Dead Man's Statute is no different when the potential plaintiff dies prior to initiating suit than it is when suit is initiated by a plaintiff who dies prior to trial. In either case, the need to protect the proceedings against self-interested perjury exists in equal measure."), *cert. denied*, 582 A.2d 490 (Md. 1990)). Defendants contend that the Maryland statute applies and argue broadly that all testimony of conversations with Ben, besides those with Mannion, should be excluded. (It appears that defendants' attorney is even objecting to his own clients'

testimony, but that would be nonsensical and clearly not a proper application of the Maryland dead man's statute.) Plaintiff contends that the Connecticut statute applies and that no testimony should be excluded.

The question of which state's dead man's statute applies in a diversity case can be a complicated one. *See* Jack B. Weinstein & Margaret A. Berger, 3 WEINSTEIN'S FEDERAL EVIDENCE § 601.05[1][a] (Joseph M. McLaughlin, ed., 2d ed. 2001); WRIGHT AND GOLD, 27 FEDERAL PRACTICE AND PROCEDURE: EVIDENCE §6005, at 59 (1990); Jack B. Weinstein, *The Uniformity-Conformity Dilemma Facing Draftsmen of Federal Rules of Evidence*, 69 COLUM. L. REV. 353, 365 (1969). Specifically, there exists a scholarly debate as to how dead man's statutes should be classified: "Some scholars have said that dead man's statutes are substance, others have said that they are procedure, while still others have put them in the 'twilight zone.'" Robert G. Lawson, *Modifying the Kentucky Rules of Evidence-A Separation of Powers Issue*, 88 KY. L.J. 525, 574 (2000).

Plaintiff notes that two leading cases have reached contrary conclusions regarding the proper interpretation and application of Rule 601 when a federal district court applies the substantive law of a non-forum state and must therefore choose between two states' dead man's statutes. *Compare Equitable Life Assurance Society of the United States v. McKay*, 837 F.2d 904 (9th Cir. 1988)(court should apply dead man's statute of forum state; such statutes are essentially procedural) *with Amell v. Kucewicz*, 53 F. Supp. 2d 145 (D. Mass. 1999)(court should apply dead man's statute of state whose rule of decision is applied; statute

treated essentially as substantive).

> Maryland's dead man's statute provides as follows:

> A party to a proceeding by or against a personal representative, heir, devisee, distributee, or legatee as such, in which a judgment or decree may be rendered for or against them, or by or against an incompetent person, may not testify concerning any transaction with or statement made by the dead or incompetent person, personally or through an agent since dead, unless called to testify by the opposite party, or unless the testimony of the dead or incompetent person has been given already in evidence in the same proceeding concerning the same transaction or statement.

MD. CODE ANN., CTS. & JUD. PROC. § 9-116 (1998). Maryland courts have not yet discussed the issue of whether the state dead man's statute is "procedural" or "substantive." Accordingly, "[w]here Maryland courts are silent or non-specific as to the applicable rule, 'this court must apply a rule which it reasonably believes would be adopted by the highest Maryland court were it to rule on the question.'" *Banca Cremi v. Alex. Brown*, 955 F. Supp. 499, 522 (D. Md. 1997) (citation omitted). Maryland's dead man's statute follows the traditional form and function. *See Reddu v. Mody*, 388 A.2d 555, 558 (Md. Ct. Spec. App.) (explaining that Maryland's dead man's statute "remains as a vestige of the common law disqualification" and that "[i]t carves from the rule rendering interested parties competent . . . an exception which disallows a party from testifying to transactions with a deceased person"), *cert. denied*, 383 Md. 736 (1978) ; *id.* at 558-59 (explaining that the "general purpose of the Statute is to equalize the position of the parties" and that such a rule "renders as much testimony as possible admissible while preventing self-interested perjury").

-21-

Connecticut's dead man's statute "is a remedial statute" that "generally admit[s] the declarations of a deceased person in actions by or against their representatives." *Starec v. Kida*, 438 A.2d 1157, 1160 n.4 (Conn. 1981) (citations omitted) (referring to CONN. GEN. STAT. § 52-172). In other words, the Connecticut statute is *not* a bar to testimony but, rather, creates an exception to state hearsay rules. *McMunn v. Pirelli Tire, LLC*, 161 F. Supp. 2d 97, 127 n.153 (D. Conn. 2001); *Rosales v. Lupien*, 717 A.2d 821, 822 (Conn. App. Ct. 1998) ("The dead man's statute creates an exception to the hearsay rule." (citing Ct. Tait & J. LaPlante, Connecticut Evidence (2d ed. 1988))). Accordingly, as the Connecticut statute (despite its title) is not a *rule of witness competency* at all, but is a mere *rule of evidence*, it is not made applicable in a diversity action in federal court under Rule 601 as federal evidence rules, including rules relating to hearsay, apply in such cases. *See McMumm*, 161 F. Supp. 2d at 127 n.153.

Therefore, the real issue in this case is not which state's dead man's statute might apply but whether I should apply Maryland's dead man statute; that is, the question is whether Maryland courts would categorize Maryland's dead man's statute as procedural (requiring that it apply in this case) or substantive (permitting its non-application in this case, as the substantive law of Connecticut applies). It seems safe to say, if presented with the question, Maryland would consider the history of the dead man's statute, its own precedent, and the musings of other courts and treatises to determine whether a dead man's statute should ordinarily be characterized as procedural or substantive. If required to decide the

issue, I would conclude that the Maryland Court of Appeals more likely than not would

determine the statute to be procedural and thus apply the state dead man's statute to all cases

tried in Maryland, notwithstanding the application of the substantive law of another state. *See*

*Wittel v. Baker*, 272 A.2d 57, 60 (Md. Ct. Spec. App. 1970) (explaining that a procedural

statute is one that relates "solely to the remedy which may be employed to enforce or to

protect a right which already exists"); *see also Grain Dealers Mut. Ins. Co. v. Van Buskirk*,

215 A.2d 467, 472 (Md. 1965) (determining that Maryland service of process law applied

in a case in which Virginia substantive law was applicable); *Finch v. Hughes Aircraft Co.*,

469 A.2d 867, 887 (Md. Ct. Spec. App. 1983); *and see Baker v. General Motors Corp.*, 522

U.S. 222, 238 (1998)(observing that a forum state decides witness competency in its

courts)(dicta). Nevertheless, for the reason explained below, I need not reach the issue of

whether Maryland would regard dead man's statutes as procedural or substantive in the

present case.

The Maryland dead man's statue recognizes the necessity of protecting estates from

interested parties and requiring these parties to provide disinterested witnesses. *See Grove

v. Funk & Snyder Administrators*, 104 A. 368 (Md. 1918); *Reddy*, 388 A.2d at 558-59. The

statute's main purpose is to prohibit self-interested perjury so as "to equalize the position of

parties by imposing silence on the survivors as to transactions with or statements by the

decedent or at least requiring those asserting claims against the decedent's estate to produce

testimony from disinterested parties." *Reddy*, 388 A.2d at 558-59. Defendants' contention

that Maryland's dead man's statute bars all testimony of conversations with Ben is overly broad.

"The testimony meant to be excluded by the Statute is only testimony of a party to a cause which would tend to increase or diminish the estate of the decedent by establishing or defeating a cause of action by or against the state." *Reddy,* 388 A.2d at 559 (citing *Snyder v. Crabbs*, 282 A.2d 6 (Md. 1971); *Wm. D. Shellady, Inc. v. Herligy*, 204 A.2d 504 (Md. 1964); *Guernsey v. Loyola Federal Savings and Loan Assn.,* 172 A.2d 506 (Md. 1960); *State, Use of Miles v. Brainin*, 167 A.2d 117 (Md. 1960); *Robinson v. Lewis*, 317 A.2d 854 (Md. Ct. Spec. App. 1974)). Party, as used in the statute, is defined as "one who has an interest in the property sought or a person having a direct pecuniary and proprietary interest in the outcome of the case." *Id.* at 560 (citing *Trupp v. Wolff*, 335 A.2d 171 (Md. Ct. Spec. App. 1975)). In practice, this definition has lead to the exclusion of testimony "not [from] those with an interest of any sort, but rather traditional real parties in interest and their representatives." *Id.*

It is clear, then, even assuming the Maryland dead man's statute applies, that at most, only the testimony of Tom, the plaintiff and a party not "called to testify by the opposite party," and only as to statements made by Ben, are encompassed by the objection made by defendants' counsel based on the dead man's statute. *See Montgomery County v. Herlihy*, 575 A.2d 784, 789 (Md. Ct. Spec. App. 1990) ("By its express terms, the statute applies only to proceedings 'by or against' a personal representative and only to testimony by *a party to*

-24-

*such proceedings* concerning any transaction with, or statement made by, the decedent."

(citations omitted; emphasis added)). Although those of Ben's children not presently named

as parties may have some interest in the outcome of this case (as they are named in Ben's

will), this interest does not render them incompetent to testify. *See Schaefer v. Spear*, 129 A.

898, 900 (Md. 1925) (citations omitted). In any event, moreover, the record does not disclose

that Tom, the substituted plaintiff, has offered any evidence of his conversations with Ben,

at least any such evidence that is not also admissible through some other witness.

Accordingly, even if the Maryland dean man's statute applies in this case, its effect on my

legal analysis and on the ultimate outcome is zero.

### D.

Defendants raise for the first time in their reply brief an argument that testimony as

to conversations with Ben are barred by the hearsay rule. This argument is raised in any

substantial form for the first time in the reply brief and in an obscure and broadly-worded

manner. The only other mention of hearsay is found in defendants' memorandum

accompanying their motion for summary judgment. In footnote 13, defendants state: "The

Complaint is not evidence; therefore, the only remaining evidence as to whether any of the

facts exist, as claimed in the Complaint, is based upon hearsay testimony of Ben's heirs, who

stand to inherit any money paid by Mike and Mary Ellen as a result of this litigation." *Id.* at

15 n.13. Plaintiff thus has had no legitimate opportunity to address this argument as it

essentially has only been discussed in the reply brief. *See, e.g., Fenner v. Bruce Manor, Inc.*,

409 F. Supp. 1332, 1339 & n.7 (D. Md. 1976); *Oken v. Corcoran*, 220 F.3d 259, 266 (4th Cir. 2000).

Even if defendants had raised this issue properly, defendants have not made an intelligible argument in support of the contention. It appears, without specifying explicitly which documents and testimony defendants believe should be inadmissible, that defendants would have this court exclude all documents and testimony regarding Ben's state of mind from 1991 through 1999. Defendants do not cite to any of this testimony or documents and do not even provide a representative example of what they would have the court exclude. It is not the responsibility of the court to sift through the documents to determine exactly what should be excluded, if anything. Accordingly, defendants' hearsay objection is not well-taken.

## IV.

Defendants seek summary judgment on the issue of limitations. Maryland's three-year statute of limitations applies to this case by analogy. *See* MD. CODE ANN., CTS. & JUD. PROC. § 5-101 (1998) ("A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."). (The primary remedy that plaintiff seeks is the imposition of a constructive trust. Given that a constructive trust is an equitable remedy, the statute of limitations does not apply; the proper defense is laches. Nevertheless, Maryland courts have applied the statute of limitations to constructive trusts by analogy. *See Villarreal*

*v. Glacken*, 492 A.2d 328, 335-36 (Md. Ct. Spec. App. 1985) (citing *Webb v. Baltimore*

*Commercial Bank*, 50 A.2d 174 (1943); *In re Insolvent Estate of Leiman*, 32 Md. 225, 240

(1870)).)

Defendants argue that plaintiff's claims are time-barred

> because suit was instituted more than three years after the wrong complained
> of, and the Defendants did nothing to conceal the causes of action to toll the
> running of the statute. Claiming that the obligation to return the money to Ben
> did not arise until after the house in Connecticut was sold does not avoid this
> result because the only way Ben could make a claim to a return of the money
> was to first invalidate the 1993 quit claim deed, which he did not do by 1996
> when the statute ran.

*Defs.' Reply Br.* at 5 n.1. Plaintiff responds that Ben did not become aware that Michael and

Mary Ellen were not going to fulfill their obligations to him relating to the $100,000 transfer

until after Michael informed him in the summer of 1999 that he had no obligation to provide

Ben with any of the proceeds from the sale of the Connecticut residence and he learned

through Marilyn of the 1993 quit claim deed. Accordingly, argues plaintiff, as the complaint

was filed on December 19, 2000, the case was instituted well within Maryland's three-year

statute of limitations.

The dispositive issue as to limitations is when plaintiff's claims accrued. Plaintiff

relies on the following special tolling provision (a codification of the "fraudulent

concealment" doctrine) in Maryland law:

> If the knowledge of a cause of action is kept from a party by the fraud of an adverse
> party, the cause of action shall be deemed to accrue at the time when the party
> discovered, or by the exercise of ordinary diligence should have discovered the fraud.

-27-

MD. CODE ANN., CTS. & JUD. PROC. § 5-203. Apart from the doctrine of "fraudulent concealment," plaintiff also argues for application of the general "discovery rule" under Maryland law for determining when a claim accrues. *See Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981)(the discovery rule applicable generally in all actions, and a cause of action accrues when the plaintiff knew or reasonably should have known of the wrong.)

Plaintiff argues that the "fraudulent concealment" doctrine applies in this case because there existed a confidential relationship between Ben and defendants. Where a confidential relationship exists, the confiding party does not have a duty to make an inquiry to discover that the confidential relationship has been abused during the continuation of the relationship. *See Dresser v. Woods*, 296 A.2d 586, 593 (Md. 1972) (citing *Herring v. Offutt*, 295 A.2d 876 (Md. 1972)). However,

> [i]f the confiding party . . ., has actual knowledge during the existence of the confidential relationship that the confidential relationship has been abused, or is in possession of facts which put such a party upon inquiry which would disclose such an abuse, then the applicable statute of limitations begins to run at the time of receiving actual knowledge or of facts placing the confiding party upon inquiry; but the burden is upon the trusted party to prove such earlier knowledge.

*Id.* (citing *Grayson v. Fidelity Life Ins. Co.,* 103 S.E. 477 (S.C. 1920)). Where a confidential relationship exists, the statute of limitations will be tolled pursuant to section 5-203 if: "(1) the relationship continues unrepudiated, (2) there is nothing to put the injured party on inquiry, and (3) the injured party cannot be said to have failed to use due diligence in detecting fraud." *Frederick Road Limited Partnership v. Brown & Sturm*, 756 A.2d 963, 975

(Md. 2000).

It is therefore necessary to determine, for purposes of summary judgment, whether a dispute of material fact is presented as to whether a confidential relationship existed between Ben and defendants. If such a relationship existed, then it is defendants' burden to prove that Ben had actual knowledge of facts placing him upon inquiry at a time prior to December 1997 (three years before Ben filed suit). If there was no confidential relationship, then the general discovery rule applies, and the defendants would have no such burden.

1.

As an initial matter, it must be noted that the question of the existence of a confidential relationship is pertinent not only to the statute of limitations analysis but also to the substantive issues material to plaintiff's claims and inherent in the motion for summary judgment. Accordingly, the determination of whether a confidential relationship existed is governed by Connecticut law, notwithstanding that that issue is potentially dispositive, in part, of the application of the Maryland statute of limitations.

The Supreme Court of Connecticut has stated that a "fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise *and is under a duty to represent the interests of the other. . . .*" *Konover Development Corp. v. Zeller*, 635 A.2d 798, 805 (Conn. 1994) (alteration in original) (internal quotation marks omitted) (emphasis added)(quoting *Dunham v. Dunham*, 528 A.2d 1123 (Conn. 1987)); *see Berty v. Gorelick*, 756 A.2d 856, 859

(Conn. App. Ct. 2000).

The law implies a confidential relationship "only where one party to a relationship is unable to fully protect its interests [or where one party has a high degree of control over the property or subject matter of another] and the unprotected party has placed its trust and confidence in the other." *Hi-Ho Tower Inc. v. Com-Tronics, Inc.,* 761 A.2d 1268, 1280 (Conn. 2000) (alteration in original) (internal quotation marks omitted) (quoting *Ward v. Lange*, 553 N.W.2d 246, 250 (S.D. 1996)). More specifically, the Connecticut courts consider two distinct types of relationships to be confidential: (1) where "one party is under the domination of another," or (2) "circumstances justify a party's belief that his or her welfare or instructions will guide the other's actions." *Starzec v. Kida*, 438 A.2d 1157, 1159 n.1 (Conn. 1981) (citing *Wimmer v. Wimmer*, 414 A.2d 1254 (Md. 1980)).

It is clear from the summary judgment record that the first scenario is not presented in this case; at no time did defendants have complete control over Ben. Furthermore, defendants cite to and distinguish a case involving the second scenario, *Hieble v. Hieble*, 316 A.2d 777 (Conn. 1972), as illustrative of the paucity of evidence of a confidential relationship in this case. In *Hieble,* the plaintiff mother sought a reconveyance of real property that she had transferred to the defendant son, claiming that the son had agreed to reconvey the same to her, upon request, if she recovered from illness. *Id.* at 779. The Supreme Court of Connecticut, in finding the existence of a confidential relationship between mother and son, reasoned as follows:

-30-

We grant that the bond between parent and child is not per se a fiduciary one;
it does generate, however, a natural inclination to repose great confidence and
trust.... *Coupled with* the plaintiff's [(the mother's)] condition of weakness,
her recent surgery, her anticipation of terminal illness, and the defendant's
implicit reassurances of his faithfulness, this relationship becomes a classic
example of the confidentiality to which equity will fasten consequences.

*Id.* at 780 (citations omitted) (emphasis added); *see Starzec*, 438 A.2d at 1159 n.1. It is clear
that factors beyond mere familial bonds are necessary to a finding that a confidential
relationship exists. *Id*.

Similarly, the Supreme Court of Connecticut concluded in *Cohen v. Cohen*, 438 A.2d
55, 60-61 (Conn. 1980), that a confidential relationship existed between mother and son. The
situation in *Cohen* involved the following circumstances: (1) the plaintiff mother bought a
condominium taken in the name of the mother and the defendant son as joint tenants with the
right of survivorship; (2) the son was nineteen years of age and contributed no money to the
purchase; (3) the mother had such an arrangement because her husband had made threats
against her life, she feared that her husband would get the condominium if she died, and she
feared that her husband's creditors could get at the condominium if it was solely in her name;
and (4) there existed an understanding that the son would deed his interest back to his mother
upon her request. *Id.* at 58.

I am constrained to agree with defendants that the facts of the present case do not
remotely share the character of those in *Heible* and *Cohen* and that the conclusion is manifest
that a reasonable fact finder could not find by a preponderance of the evidence that a

confidential relationship existed between defendants and Ben. It is clear that a level of trust

subsisted between defendants and Ben as family members and as partners in an arrangement

that was to benefit all participants, but the relationship was not so one-sided as to support the

imposition of a confidential relationship.

Plaintiff argues that a confidential relationship existed because Brian and Michael

agreed to look after their father. *Deposition of Richard Brian Maltas* at 36-37. However,

this conversation was solely between Brian and Michael and was plainly in the context of

making certain that their recently widowed father got along and not that they would be

responsible for all of their father's financial matters. *Id.* at 36. Plaintiff also remarks that

"Michael described several instances where he 'explained' various legal and financial

concepts to his father who needed assistance in understanding." *Response in Opp. to Defs.'*

*Mot. to Dismiss or for Summ. J.* at 19 (citing *Dep. of Michael L. Maltas* at 31-33). However,

Michael's testimony in these regards must be viewed in proper context. This testimony

simply summarizes the meetings between Michael, Ben, and Mannion regarding the effects

of the 1992 quit claim deed on refinancing--a topic that Michael admitted that he had

difficulty understanding himself. *Dep. of Michael L. Maltas* at 31-32. Michael testified on

deposition that when he first found out that he was having difficulty refinancing the

Connecticut residence, he did not completely understand the source of the difficulty but

attempted to explain to Ben the situation. *Id.* Then Ben and Michael both spoke to Mannion

about the situation who explained the complication to both of them, after which, Michael

-32-

again spoke to Ben to make certain that Ben understood what Mannion had related to them.
*Id.* at 32-33. There is not a scintilla of evidence that the refinancing was a ruse or a pretext
concocted by Michael and Mary Ellen to obtain a release of the lien created by the 1992 quit
claim deed.

As a matter of law, despite some seeming uncertainty on Mannion's part about the
issue (as well as some uncertainty or equivocation on the part of the parties here), Mannion
acted as Ben's attorney (as well as the attorney for Michael and Mary Ellen) in connection
with the transactions involving both quit claim deeds. Specifically, although the question of
the existence of an attorney-client relationship is ordinarily an issue of fact, *Dunham v.
Dunham*, 528 A.2d 1123, 1132 (Conn. 1987), reasonable minds correctly informed on the
law could not disagree on this record that Mannion had an attorney-client relationship with
Ben in drafting the 1993 quit claim deed and in undertaking to ensure that Ben fully
understood the import of the transaction. *See* Complaint ¶ 19(alleging that Ben "did not have
any *independent* counsel" (emphasis added)). Quintessentially, that was lawyer's work being
done by a lawyer in a lawyer's office for a layperson client; of course, the fact that Ben did
not pay Mannion is irrelevant. *Cf. Dunham,* 528 A.2d at 1132 (affirming trial court's decision
to submit issue of attorney-client relationship to jury; no evidence that plaintiff, ostensible
client, paid defendant/lawyer, who was plaintiff's older brother). Morever, as set forth
earlier, Mannion's contemporaneous assessment of Ben's capacity to understand and
appreciate the purpose and consequences of Ben's execution of the 1993 quit claim deed--

Ben was "lucid and understanding and responsive to [Mannion's] explanations of what he was doing"-- is unrebutted by any contrary contemporaneous evidence of Ben's mental capacity during the relevant period-- late 1993. The fact that Ben, by 1999 and at age 81, behaved in such a way that he left the impression with his attorney in Alaska, DeVeaux, that he had reduced lucidity, is not probative of Ben's capacity in 1993. The same is true as to Ben's childhood injury.

Moreover, it is of scant consequence that Michael was a college graduate while Ben had completed no more than ten years of school and "took no part in matters of personal or family finance." *Response in Opp. to Defs.' Mot. to Dismiss or for Summ. J.* at 20. To be sure, Brian testified that it was his wife Marilyn that helped Ben with his personal finances. She would simply sit with him and supervise to make certain that he knew where to put the correct information when he made out checks. *Deposition of Richard Brian Maltas* at 31-32. Brian admitted, however, that neither of them was directing him as to how he should spend or dispose of his money. *Id.* at 32. Marilyn testified that she had no information at all as to how Ben managed his money. She did not know any of the details regarding in what manner the money was transferred from Ben to Michael and Mary Ellen in 1999. Further, Marilyn was never on any bank account with Ben. *Dep. of Marilyn Maltas* at 5-7. Michael did not handle Ben's finances at any time, and did not know anything about how Ben handled his money. *Dep. of Michael Maltas* at 81-82. Mary Ellen testified to the same effect. *Dep. of Mary Ellen Maltas* at 77.

-34-

In contrast to the circumstances in *Heible*, where the parties did not dispute the existence of an oral agreement to return the property to the mother, in the instant case, there is no evidence that such an agreement survived Ben's knowing and voluntary execution of the 1993 quit claim deed. Although, as discussed *supra*, there is evidence of some discussions during 1999 regarding the return of some money to Ben, it is unclear to what this testimony refers and how much money Ben actually expected to get back. Indeed, if credence is given to all of plaintiff's evidence in the record of Ben's variable demands upon Michael and Mary Ellen– Marilyn described Ben's articulation of his claims as follows: "in one conversation, he said he wanted $35,500 . . . [in another conversation] [h]e wanted 30,000, and then 5,500 for a car loan," *Dep. of Marilyn Maltas* at 12-- this court lacks jurisdiction over this case because the claim would not satisfy the $75,000 jurisdictional amount required of diversity cases. 28 U.S.C. § 1332.

Unlike *Heible*, in this case, as a matter of law, Ben received exactly what he "bargained for" in providing the funds to Michael and Mary Ellen in 1991--a place to live for the rest of his life. Unfortunately for the Maltas family, Ben's unilateral decision to remain in Alaska after 1994 was not one of the scenarios or eventualities that Mannion foresaw in drafting the 1992 quit claim deed; and, neither did Brian or Marilyn anticipate such an outcome, and they were fully involved in making the arrangements to obtain Mannion's services to prepare the 1992 quit claim deed in a commendable effort to safeguard Ben's interests. Brian and Marilyn had engaged in a similar transaction with one of Marilyn's

-35-

parents.

As mentioned above, the absence of a confidential relationship is also illuminated by the manner in which Ben, with the assistance of counsel and his son Brian, undertook to protect his interest in the 1992 quit claim deed. Under the literal terms of the 1992 quit claim deed, after Ben had been absent from Connecticut starting in 1994 for more than six months, Michael and Mary Ellen would have had the right to file an affidavit releasing Ben's lien. Thus, as things turned out, Ben's execution of the 1993 quit claim deed releasing his lien on the Connecticut residence would have been largely irrelevant to the ability of Michael and Mary Ellen to sell the Connecticut residence in 1999 and relocate to the Washington area even if the 1993 quit claim deed had not been executed by Ben.

Finally, even if the record is regarded as containing substantial evidence of a confidential relationship between Ben and Michael and Mary Ellen, the record also shows that there was no abuse of that relationship by Michael and Mary Ellen. In other words, it is significant, in determining whether there was an abuse of the ostensible confidential relationship, that there is no evidence to refute the contention of Michael and Mary Ellen that Ben was always free to return to the Connecticut residence (and later, to come and live with them in Maryland if Ben so elected), as Ben indeed contemplated at one point, an idea he mentioned in a letter to Michael in 1996. In sum, on these facts, no reasonable fact finder could conclude that Michael and Ellen had a confidential relationship with Ben from 1991 through 1999 on the basis that "circumstances justif[ied Ben's] belief that his . . . welfare or

-36-

instructions [would] guide the . . . actions [of Michael and Mary Ellen]," *Starzec*, 438 A.2d at 1159 n.1., or that, if so, there was any abuse of that relationship by Michael and Mary Ellen.

Plaintiff's reliance on *Marcucci v. Marcucci*, 65 F.3d 986 (1st Cir. 1995), in which the First Circuit applied New Hampshire law, is also unavailing. In *Marcucci*, the First Circuit determined that the statute of limitations had been tolled by defendant's engendering in plaintiff a reasonable sense of confidence, which disguised the need for any legal action. *Marcucci*, 65 F.3d at 989 (citing *New Hampshire Donuts v. Skipitaris*, 533 A.2d 351, 356 (N.H. 1987)). The court added that this "confidence" was warranted due to plaintiff's "close family relationship and his advanced age and highly dependent state." *Id.* Though the Maltases appear to have been a fairly close family, Ben was not highly dependent on his family. Ben was always employed and had an active social life. The plaintiff in *Marcucci* is described as a 95 year old man who was "virtually indigent" who needed money to continue to afford his retirement home accommodations. *Marcucci*, 65 F.3d at 987. Moreover, the First Circuit took into account "the nature and purpose of [plaintiff's] transfers" of his property and money to his wife and later to the defendant; the purpose of which was to insulate his holdings from potential business liability claims and because of his advanced years. *Id.* at 987, 989.

For the reasons set forth, therefore, reasonable minds could not reasonably conclude that there existed a confidential relationship between defendants and Ben from 1991 through

-37-

1999.

2.

As there was no confidential relationship, the discovery rule applies to the issue of

accrual of plaintiff's causes of action. Defendants argue that the statute of limitations began

to run in 1993 when Ben signed the second quit claim deed, ignoring any argument that an

agreement existed between Ben and Michael that Michael would give Ben some money.

Viewing the facts in the light most favorable to plaintiff, assuming for the limited purpose

of this discussion that there was some agreement between Ben and Michael and Mary Ellen,

it is reasonable on this record to conclude, as a matter of law, that Ben would not think about

getting money back until the Connecticut residence was sold in 1999, the point at which

Michael would have funds with which to pay Ben. It was also at this point that Ben stated

that he would not be returning to live with Michael, and it was around this time that Michael

told Ben that he would give him some money. *Dep. of Michael Maltas* at 51-52. In short,

assuming there was an agreement (or that Ben believed there was an agreement), it is

reasonable to conclude that Ben would not be on notice that he should be receiving money

from Michael until the house in Connecticut was sold. Thus, the complaint was timely filed,

i.e., within three years of the accrual of plaintiff's claims.

V.

I shall turn, then, to the merits of plaintiff's claims. As explained below, no reasonable

factfinder could reasonably conclude under the law of Connecticut that plaintiff is entitled

to relief in this case. Accordingly, judgment shall be entered in favor of defendants.

*Constructive Trust*

Summary judgment shall be granted in favor of defendants with regard to plaintiff's claim for constructive trust because, as was discussed *supra*, there was no confidential relationship between Michael and Ben at the time of the transfer of the $100,000 in 1991, at the time of the execution of the quit claim deeds in 1992 and 1993, or at the time the Connecticut residence was sold in 1999. *See, e.g., Gulack v. Gulack*, 620 A.2d 181, 185 (Conn. App. Ct.) ("Before a trial court finds that a constructive trust exists and should be imposed, the court must find that a confidential relationship existed between the transferor and the transferee at the time of transfer of property." (citing *Starzec v. Kida*, 439 A.2d 1157 (Conn. 1981); *Filosi v. Hakins*, 438 A.2d 55 (Conn. App. Ct. 1980); *Downey v. Downey*, 472 A.2d 1296 (Conn. App. Ct. 1984))).

*Unjust Enrichment*

Summary judgment shall granted in favor of defendants on this claim. Unjust enrichment "applies whenever justice requires compensation to be given for . . . services rendered under a contract, and no remedy is available by an action on the contract. . . . Lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." *Paulsen v. Kronberg*, 786 A.2d 453, 455 (Conn. App. Ct. 2001) (internal quotation marks omitted) (alterations in original) (quoting *Maris v. McGrath,* 753 A.2d 390, *cert. granted on other grounds*, 759 A.2d 1025 (2000)). Plaintiffs seeking recovery for unjust enrichment

must prove (1) that defendants were benefitted; (2) that the defendants unjustly did not pay

the plaintiff for the benefits; and (3) that the failure of payment was to plaintiff's detriment.

*Id.* Plaintiff has not met its burden.

Indisputably, as plaintiff argues, defendants benefitted from the use of Ben's $100,000

in making a down payment on the Connecticut residence and for living expenses. But

plaintiff's contention founders on the further argument that "because Michael and Mary Ellen

did not build an addition to the Connecticut residence as was agreed between the parties,

[Ben] was unable to quietly enjoy his living space in the Connecticut residence was thus

constructively evicted." *Response in Opp. to Defs.' Mot. to Dismiss or for Summ. J.* at 25-26.

While there was discussion within the family that the $22,000 would be used to expand the

house, there is not a scintilla of evidence that Ben was upset about the addition not being

built or that Ben was "constructively evicted." Ben had his own apartment in the house, and

there is no testimony that he was dissatisfied with his living quarters or that that was the

reason he left Connecticut to live with Tom in Alaska. Michael and Mary Ellen testified that

they believed Ben fully understood that the money intended for use in building the addition

was being used otherwise because Michael and Mary Ellen were unprepared for the

increased expenses in maintaining their first home. There is no substantial evidence in the

record to dispute these facts, and there is certainly nothing "unjust" in a child's decision to

accept such beneficence from a parent under such circumstances.

Plaintiff next argues that "[u]pon the sale of the Connecticut residence, Michael and

Mary Ellen did not return any of the funds owed to [Ben], nor did they share any of the leasing profits. As a result, [Ben] was effectively deprived of more than half of his individual net worth." *Response in Opp. to Defs.' Mot. to Dismiss or for Summ. J.* at 26. But there is no proof that money was "owed" or that a paramount equity rested with Ben under the circumstances. After his discussion with Ben in 1999 regarding Michael sending him some money, Michael sent Ben $5,000. *Id.* at 57-60. There is no evidence that Michael and Ben had an agreement that defendants would repay Ben the $22,000; Michael's elliptical acknowledgment to Ben at the 1992 deed-signing that the matter of the "$25,000" was "between you and me" does not provide substantial support for an inference that an alleged obligation unenforceable at law should be enforced in equity against Michael and Mary Ellen.

    As a matter of undisputed fact, moreover, there is no evidence of an agreement that defendants would ever repay, or be required to repay, any portion of the $100,000, even in the 1992 quit claim deed. The 1992 quit claim deed provided for a *conditional* return of money based on certain contingencies that did not exhaust the universe of possibilities. This is not surprising since, as a matter of common understanding, conveyance of more than one half of a parent's "net worth" to only one of several offspring may be a "detriment" to the non-recipients, but it is not inevitably a "detriment" to the parent who provides the funds. Thus, to infer from these facts that Michael and Mary Ellen have been *unjustly* benefitted would be to ground a legal conclusion in speculation and conjecture rather than in proof of

culpable wrongdoing.

*Undue Influence*

Plaintiff also argues that defendants exercised undue influence over Ben. "Undue influence is the exercise of sufficient control over a person, whose acts are brought into question, in an attempt to destroy his free agency and constrain him to do something other than he would do under normal control." *Pickman v. Pickman* 505 A.2d 4, 7 (Conn. App. Ct. 1986) (citing *Reynolds v. Molitar*, 440 A.2d 192 (Conn. 1981)). Connecticut law recognizes four elements of undue influence: (1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; (4) a result indicating undue influence. *Id.*

Plaintiff has not demonstrated that any of these four elements are present; rather, he bases his argument primarily upon the contention that a confidential relationship existed between defendants and Ben. As no such relationship existed, this argument lacks merit. Moreover, there is no evidence that Ben was caused or induced "to act contrary to his wishes." *Lee v. Horrigan*, 98 A.2d 909, 911 (Conn. 1953) (citation omitted) (internal quotation marks omitted). There is no testimony that Ben ever felt that he was forced into any of his transactions with defendants. Rather, "moderate and reasonable solicitation, entreaty or persuasion, though yielded to, if done intelligently and from a conviction of duty, would not vitiate a will in other respects valid." *Id.* (citation omitted) (internal quotation marks omitted). Mannion's deposition testimony wholly undermines the contention that there

-42-

was undue influence.

Plaintiff contends that *Smith v. Ellision*, 15 P.3d 67 (Or. Ct. App. 2000), is an analogous case and should be followed. However, in *Ellision*, the Court of Appeals of Oregon determined that a confidential relationship existed and as "there is a confidential relationship between the parties, only slight evidence is necessary to establish undue influence." *Id.* at 70 (citing *Penn v. Barrett*, 541 P.2d 1282 (Or. 1975)). As explained above, the same is not true in the present case.

*Invalidity of the 1993 Quit Claim Deed*

Plaintiff argues that the 1993 quit claim deed is invalid because it was an aberration from the normal course of dealing with regard to Ben's business, i.e., Brian was ordinarily involved in such decisions. Plaintiff also argues that the 1993 quit claim deed is invalid because Ben did not sign it of his own free will. As discussed *supra*, there is no evidence that Ben did not sign that deed of his own free will. Furthermore, there is no evidence that Ben was under any disability or condition that would have impaired his ability to understand the nature of the document. Ben was as free to give up the life estate created by the 1992 quit claim deed as he was to provide the $100,000 to Michael and Mary Ellen in 1991 without first documenting the arrangement in advance. Ben was entitled to live at the Connecticut residence, although, as he was free to elect, he chose not to but to move to Alaska instead. Brian and Tom express disbelief that their father would execute such a document if he were possessed of his faculties; however, the 1992 quit claim deed recites that Ben's intention was

-43-

that, if he died, or moved away for more than six months, there was to be no repayment of money by Michael and Mary Ellen. The uncontested validity of the one decision provides insight into the likely validity of the latter. Accordingly, summary judgment shall be granted in favor of defendants.

*The Remaining Claims*

Plaintiff does not dispute and so has conceded that judgment as to his remaining claims should be granted in favor of defendants. As such, summary judgment is granted in favor of defendants on the remaining claims of civil conspiracy, breach of fiduciary duty, and accounting.

VI.

For all of these reasons, defendants are entitled to judgment as a matter of law. An order follows.

Filed: April 26, 2002

ANDRÉ M. DAVIS
United States District Judge