IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOHN T. MALTAS, PERSONAL REPRESENTATIVE OF THE ESTATE OF RICHARD B. MALTAS, DECEASED, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. AMD 00CV3671 |
| MICHAEL L. MALTAS, MARY ELLEN MALTAS, | * | |
| | * | |
| Defendants. | | |

\* \* \* \* \* \* \* \* \* \*

## JOINT PRETRIAL ORDER

John T. Maltas, Personal Representative of the Estate of Richard B. Maltas, Deceased, plaintiff, and Michael Maltas and Mary Ellen Maltas, defendants, by their respective attorneys, submit the following Joint Pretrial Order.

**A.     PLAINTIFF'S BRIEF STATEMENT OF FACTS AND LEGAL THEORIES**

Richard B. Maltas ("Mr. Maltas"), was born on February 15, 1918. When Mr. Maltas was approximately nine years old, his cousin threw a rock or brick and hit Mr. Maltas in the head. Mr. Maltas' academic performance suffered as a result of the hit and he sustained permanent mental and physical injuries from the incident. The fact of the injury and its effects were well-known to all of his family members. Mr. Maltas completed no more than 10 years of school.

Mr. Maltas spent his working life engaged in jobs that did not require any knowledge of legal, financial or business matters. Mr. Maltas' writings indicate that he had great difficulty reading and writing.

On February 18, 1942, Mr. Maltas married Virginia Tallon ("Mrs. Maltas"). Mr. and Mrs. Maltas had seven children: Richard Brian ("Brian");[1] Virginia, John Thomas ("Tom"), George, Michael,[2] Jeanne and Patrice. Mrs. Maltas was actively involved in local politics and her community. She handled all of Mr. Maltas' finances. Mrs. Maltas suffered a stroke, lapsed into a coma and died on May 21, 1991.

Mr. Maltas "was extremely despondent" after his wife's death and came immediately to live with his son Brian. Mr. Maltas relied upon two of his sons, Brian and Michael, and their respective spouses, Marilyn and Mary Ellen, to conduct his financial affairs after Mrs. Maltas' death. After three or four weeks, Mr. Maltas went to stay in Alaska with his son Tom for several weeks. Tom observed during this period in 1991 that his father was extremely depressed.

While Mr. Maltas was in Alaska, his sons Brian and Michael arranged for their parents' house to be sold. The house in which Mr. and Mrs. Maltas resided was sold in September 1991 for $202,500.00. After the mortgage on the property was satisfied, real estate commissions were paid and legal fees were paid, the net proceeds from the sale were $171,115.00. The house was Mr. Maltas' primary asset and the proceeds from the sale essentially equaled Mr. Maltas' net worth. During this time, Brian and Michael discussed their father's future. It was clear that Mr. Maltas could not live alone. Prior to

---

[1] Brian is married to Marilyn Maltas, who was deposed in this matter and has knowledge of facts relevant to the case.

[2] Michael is the defendant in the present case. He is married to Mary Ellen Maltas, who also is a defendant in the present case.

Mrs. Maltas' death, Mr. and Mrs. Maltas and Michael had had discussions about Mr. and Mrs. Maltas' buying a duplex residence with Michael and his wife, Mary Ellen. Subsequent to Mrs. Maltas' death Brian and Michael discussed Mr. Maltas' providing the down payment for a house in which Mr. Maltas, Michael and Mary Ellen (along with the three children of Michael and Mary Ellen) could live.

In November 1991, Michael and Mary Ellen purchased a residence at 1 Sylvan Drive, Ridgefield, Connecticut ("Connecticut residence"). The purchase price of the house was $212,500.00. The down payment on the Connecticut residence was approximately $78,000.00.

In September 1991, prior to Michael's and Mary Ellen's purchasing the Connecticut residence, Mr. Maltas transferred $100,000.00 to Michael and Mary Ellen. Michael and Mary Ellen admit that the down payment for the residence came from the $100,000.00 transferred to them. The remainder of the $100,000.00 was to be used to put an addition on to the Connecticut residence to provide private space for Michael's and Mary Ellen's children to play and not disturb Mr. Maltas.

Mr. Maltas, Michael, Mary Ellen and the three children of Michael and Mary Ellen moved into the Connecticut residence in November 1991. Mr. Maltas lived in the basement of the residence. The basement of the house was not exclusively for Mr. Maltas' use – the laundry room and garage used by Michael and Mary Ellen also were in the basement. A dog which was obtained later for the children was kenneled in the basement. The addition for the children never was built.[3] Instead, Michael and Mary Ellen gradually siphoned off the remainder of the $100,000.00 for their own living expenses. Michael and Mary Ellen claimed that these living expenses were for

---

[3] Whether Mr. Maltas was afforded a separate area for quiet enjoyment is at issue.

unanticipated high cost utility bills connected with their new housing situation.[4]  Michael and Mary Ellen also represented that the use of the remainder of the $100,000.00 was with the knowledge and consent of Mr. Maltas.[5]

Both Michael and Mary Ellen testified in their respective depositions that they had no understanding of the respective rights and obligations of Mr. Maltas and themselves with respect to the transfer of the $100,000.00 at the time the transfer occurred.  According to Brian Maltas, the purpose of the transfer of the $100,000.00 was purchase the Connecticut residence and to benefit all parties – Mr. Maltas, Michael and Mary Ellen.  In January 1992, subsequent to the transfer of $100,000.00 from Mr. Maltas and two months after Michael and Mary Ellen purchased the Connecticut residence, Michael and Mary Ellen granted a Quit Claim Deed to Mr. Maltas ("1992 Quit Claim Deed").  The Quit Claim Deed was drafted by James M. Mannion, a Connecticut lawyer who previously had represented Brian Maltas.  The terms of the 1992 Quit Claim Deed were largely based upon an agreement into which Brian Maltas' mother-in-law entered with Brian and his wife.  The apparent purposes of the 1992 Quit Claim Deed were, inter alia: (1) to give Mr. Maltas a legal right to remain in the Connecticut residence for life; and (2) to provide a refund mechanism of for the $75,000 down payment on the Connecticut residence in the event that Michael and Mary Ellen should move more than 75 miles from Ridgefield, Connecticut.  The 1992 Quit Claim Deed also provided that the life estate would terminate if Mr. Maltas absented himself from the Connecticut residence

---

[4] The credibility of Michael and Mary Ellen is at issue.  More specifically, whether the monies that should have been used for Mr. Maltas's benefit were instead used by Michael and Mary Ellen for their own personal benefit, such as to fund personal investments or personal drug and alcohol addictions.

[5] Mr. Maltas's knowledge and voluntary consent are at the heart of this case.  Even absent any misrepresentation, the use of substantial sums of money for such long durations of time raises separate issues regarding the time-value of the money.

for a consecutive period of six months.  This provision was inserted into the 1992 Quit Claim Deed to protect the life estate from Medicare's spend down provisions in the event that Mr. Maltas was placed in a nursing home.

The 1992 Quit Claim Deed was not negotiated among the parties.  Mr. Mannion, who drafted the document, appears to have attempted to represent all parties to the transaction.[6]  The 1992 Quit Claim deed did not provide for several matters that should have been addressed.  For example, the 1992 Quit Claim Deed did not address the eventuality that Mr. Maltas would want to move from the Connecticut residence because of conditions at the Connecticut residence (as opposed to his moving into a nursing home). The 1992 Quit Claim Deed also did not address the issue of the monies that were not used for the down payment on the Connecticut residence and the contemplated addition.

In 1993, Michael and Mary Ellen decided to refinance the Connecticut residence.  They were unable to refinance the house because of the existence of the 1992 Quit Claim Deed.  Michael Maltas contacted James M. Mannion and Mr. Mannion drafted a new Quit Claim Deed ("1993 Quit Claim Deed").  Mr. Mannion's recollection of the signing of the 1993 Quit Claim Deed is as follows:

> Q.     And do you have any recollection of the signing of the document?  What happened?
>
> A.     My recollection was that I was sitting across the table from them [*i.e.*, Mr. Maltas ("Ben") and Michael]. Ben was on my left, and to his left was Michael, and I went through the discourses I described earlier with Ben, as to do you understand what you are giving up.  This is a release. You are giving up your rights to do this and to do that and

---

[6] Mr. Mannion represented Michael and Mary Ellen with respect to the purchase of the Connecticut residence.

> the other thing. **And as I remember, Ben, he raised his hand, yeah, Michael and I have talked; its all taken care of.**
>
> Q. Do you recall if Michael said anything during that meeting?

Michael admitted at his deposition that he had told his father at the time he signed the 1993 Quit Claim Deed that his father could continue to live in the Connecticut residence as long as he desired. Michael also admitted that he did not have any discussion about financial issues with his father at that time.

Mr. Maltas' physical and mental condition raises significant questions about his ability to understand the significance of the 1993 Quit Claim Deed. Although Mr. Mannion testified at his deposition that he felt that Mr. Maltas understood the significance of the 1993 Quit Claim Deed when it was signed, Mr. Mannion was not then aware that Mr. Maltas had suffered a head injury as a child, had experienced academic difficulties after the head injury, had little or no experience with financial affairs prior to the death of his wife and had significant hearing problems. Mr. Maltas would pretend to hear and understand what people said to him, but based on his subsequent reactions or conduct, it was apparent that he could not hear well. Often he did not grasp nuances of conversation and did not hear or understand words or sentences completely.

Brian Maltas, who had extensive contact with both Mr. Maltas and Michael during the 1991 to 1994 timeframe testified at length about Mr. Maltas' complete trust in Michael. Mary Ellen Maltas confirmed the trust that Mr. Maltas placed in Michael and Mary Ellen regarding the 1993 Quit Claim Deed.

Brian Maltas, who had been involved in every significant financial transaction into which his father entered between 1991 and 1994, was not informed of the 1993 Quit

Claim Deed and was excluded from the transaction. ("The only one that counted for a lot of money, I wasn't there. The only one that was there was Mike and Dad."). Had Brian not been excluded from the events surrounding the 1993 Quit Claim Deed, it probably would not have been signed. As Brian testified at his deposition:

> If I was in the room when that second document was ready to be signed, there wouldn't be a signature on this. I would say, hey, wait a minute, you effectively got $100,000.00 of Dad's money, he lived with you for a year and half, maybe two, I would say that's pretty stiff rent.

At the time of the 1993 refinancing of the Connecticut residence, Michael and Mary Ellen received $10,381.11 in cash back from the transaction. None of the money was refunded to Mr. Maltas.

In 1994, Mr. Maltas moved to Alaska. That Mr. Maltas intended to remain a permanent resident of Alaska is evident from his continued participation in the Alaska Permanent Fund and Longevity Bonus program as well as his Alaska voting record, Alaska driver's license, and his enjoyment of the state itself. In 1996, Michael took a job in Washington, D.C., and the Connecticut residence was leased to others for two years. Michael and Mary Ellen decided to sell the Connecticut residence in 1999. The closing of the sale of the Connecticut residence occurred on July 30, 1999. The sale price was $249,000.00 and Michael and Mary Ellen received $87,036.70 after the mortgage, commissions and fees were paid. Michael and Mary Ellen used $60,440.47 from the proceeds of the Connecticut residence to purchase a residence in Riva, Maryland. The money from the sale of the Connecticut residence that was not used by Michael and Mary Ellen for the purchase of their Maryland residence was used by Michael and Mary Ellen for their own purposes. They did not refund any money to Mr. Maltas.

Mr. Maltas believed that Michael and Mary Ellen were going to refund money to him when they sold the Connecticut residence. At some point in 1999, Mary Ellen Maltas informed Marilyn Maltas that Michael and Mary Ellen did not owe Mr. Maltas any money; Mary Ellen said that: "Michael read the contract, we don't owe him any money." Marilyn Maltas then investigated and found the 1993 Quit Claim Deed in the land records of Ridgefield, Connecticut. Tom Maltas took Mr. Maltas to consult with an Alaska attorney, LeRoy Eugene DeVeaux, regarding the 1992 Quit Claim Deed and the 1993 Quit Claim Deed. Mr. DeVeaux met alone with Mr. Maltas. When Mr. DeVeaux explained the ostensible significance of the 1993 Quit Claim Deed, Mr. Maltas was extremely surprised and agitated. It was clear to Mr. DeVeaux that Mr. Maltas had no concept of the meaning or significance of the 1992 Quit Claim Deed or the 1993 Quit Claim Deed.

Mr. Maltas's surprise at Michael's refusal in 1999 refund any monies to him is apparent from Mr. Maltas' letters to Brian and Michael. Mr. Maltas' trust in Michael and his anguish upon his discovery that Michael had betrayed his trust is palpable in the letters.

Mr. Maltas transferred $100,000.00 to Michael and Mary Ellen. In return for his $100,000.00, he lived in a basement for thirty months – a basement to which he did not even have exclusive use. The value of Mr. Maltas' use of the Connecticut residence was significantly less than $100,000.00. Michael and Mary Ellen not only derived the significant benefit of living, with their three children, in the primary spaces of the Connecticut residence for five years, they derived rents from the residence when it was leased and took cash out of the Connecticut residence when they refinanced it in 1993

and when the sold it in 1999.  They also used part of the proceeds from the Connecticut residence to purchase their current residence in Maryland.  Michael and Mary Ellen took unfair advantage of Mr. Maltas and continue to enjoy the benefits of that unfair advantage.

The legal theories upon which the Estate of Richard B. Maltas bases its case are as follows.

The 1993 Quit Claim Deed was obtained by fraud and was void ab initio.  Accordingly, Mr. Maltas seeks a declaration pursuant to 28 U.S.C. § 2201(a) the 1993 Quit Claim Deed was void ab initio and has no effect.

Michael and Mary Ellen Maltas have been unjustly enriched by retaining the funds transferred by Mr. Maltas after they have sold the Connecticut residence and without their building the addition for the use of Mr. Maltas.  Michael and Mary Ellen Maltas have been further unjustly enriched by not remitting any interest on the funds or any profits they may have made from investment of the funds.

A confidential relationship existed between Michael Maltas, Mary Ellen Maltas and Mr. Maltas.  As a result of that confidential relationship, a constructive trust was created by the transference of the $100,000.00 to Michael and Mary Ellen by Mr. Maltas.  Mr. Maltas' share of the proceeds from the sale of the Connecticut residence translates to a 43.2% share of the Maryland residence (*i.e.*, $115,536.00 derived from the Connecticut residence divided by the $267,250.00 purchase price of the Maryland residence).  The constructive trust would be equal to that 43.2% share of the Maryland residence.

As a result of their confidential relationship with Mr. Maltas, Michael and Mary Ellen Maltas owed Mr. Maltas a fiduciary duty. Michael and Mary Ellen Maltas' taking and use of the funds for their own benefit breached their fiduciary duty to Mr. Maltas.

At the time of the 1991 transfer of $100,000.00 to Michael and Mary Ellen, Michael had undue influence upon Mr. Maltas by virtue of his father-son relationship with Mr. Maltas, Mr. Maltas' limited Education The transfer of funds to Michael and Mary Ellen Maltas by Mr. Maltas was accomplished by the use of undue influence by Michael upon Mr. Maltas.

### B. DEFENDANTS' BRIEF STATEMENT OF FACTS AND LEGAL THEORIES

Michael and Mary Ellen Maltas and Michael's father, Ben, agreed in 1991 that Ben would give $100,000.00 to Michael and Mary Ellen to help them purchase a home that would contain living space for Ben. In return, Michael and Mary Ellen promised Ben that they would provide Ben with a home for the rest of his life.

Michael was working weekdays and weekends and traveling extensively, and had very little if anything to do with the selection of the home in fact he and Mary Ellen purchased in the fall of 1991. The home was selected by Mary Ellen and Marilyn, Brian Maltas' wife, and was based on the fact that the home had a lower level that contained a kitchen, living room, bedroom, and bathroom into which Ben moved. The lower level was not a basement. It had a sliding glass door onto a deck which looked out on a lake behind the house.

Approximately $80,000 of the $100,000 was used for the purchase of the home. The balance was intended to expand in the upstairs a level which contained a living room, kitchen, and three bedrooms. Michael and Mary Ellen lived in one bedroom, their son

10

lived in a second bedroom, and their daughters lived in the third bedroom. The balance of the gift to Michael and Mary Ellen was expended over time on the increased costs and operating the house, which was very poorly insulated, and which had a mortgage that required a monthly payment that was much larger then Michael and Mary Ellen were used to. The house was heated by electricity, a very expensive source of heat, and utility bills sometimes exceeded $500 a month.

During this time, Michael was the sole provider. Mary Ellen stayed at home raising their three young children. Ben love his grandchildren (he went on all the family vacations - camping trips, Block Island) and lived upstairs. He did not cook in the kitchen downstairs, preferring to take all his meals with the Maltas family in the upstairs kitchen. The children were not allowed to enter the lower level unless Ben's bedroom door was open. If his door was open, that meant Ben was available and they could go downstairs. If Ben's door was closed, they did not go into the basement. Ben never complained about the children or their behavior.

In 1991, Ben had full control of his faculties. Gary Chontos, cousin to Michael and Brian, who is a union electrician, was living in Brian's house in 1991 and has knowledge of Ben's mental state and Ben's intention to gift money to Michael and Mary Ellen in return for a place to live for the rest of his life. Gary will testify that Ben knew exactly what he was doing and that Ben wanted to give the money to Michael and Mary Ellen.

Michael and Mary Ellen always provided Ben a place to live, even after they moved to Maryland. Ben decided to go to Alaska, and continued to tell Michael and

Mary Ellen that he wanted to return to Connecticut, and, after Michael and Mary Ellen moved to Maryland, he said he preferred moving to Maryland instead of Connecticut.

There was no confidential relationship between Michael and Ben. For example, Ben managed his own finances while he lived with Michael and Mary Ellen in Connecticut. Michael and Mary Ellen had no knowledge of or control over Ben's finances while he lived with them. In addition, the balance of the funds from the sale of Ben's home after Michael's mother and Ben's wife, Virginia, died in 1991, was invested by Brien, without any participation or knowledge on the part of Michael as to what happened to those funds.

Ben made his own decisions as to where he lived and what he did with his money. He never asked for the return of the money until 1999, five years after he had left Connecticut for Alaska. The reason he did not do so is not only because he knew he had a place to live with Michael and Mary Ellen, and was still undecided as to whether to stay in Alaska, but because the 1991 agreement was that Michael and Mary Ellen provide Ben with a place to live for the rest of his life, which they did. The 1992 and 1993 Quit Claim Deeds did not change that agreement. Ben and Michael recognized this because the underlying obligation remained to provide Ben with a place to live. There was never any agreement as to what was to be done with the remainder of the $100,000 after the Connecticut house was purchased in 1991.

The 1992 and 1993 Quit Claim Deeds do not alter this result because the evidence shows that Ben assumed, and the Defendants confirmed even after they moved to Maryland, that they had kept a place for Ben to live and were willing to take him back at any time. This was the agreement Ben and the Defendants had; not that there would be

the return of any money after 1991, but that they would provide him with a place to live for the rest of his life.

Consequently, the Defendants do not owe Ben's estate anything as a result of the transfer of the $100,000.00 made by Ben to them in 1991. Ben got what he bargained for − a place to live for the rest of his life.

**C.    COUNTERCLAIM, CROSS CLAIM OR THIRD-PARTY CLAIM**

There are no counterclaims, cross claims or third-party claims.

**D.    AMENDMENTS REQUIRED OF THE PLEADINGS**

There are no amendments required of the pleadings.

**E.    ISSUES TO BE ABANDONED**

There are no issues to be abandoned.

**F.    STIPULATIONS OF FACT**

Plaintiff stipulates to the authenticity and admissibility of all of the defendant's exhibits and defendants stipulate to the authenticity and admissibility of all of plaintiff's exhibits.

Further, plaintiff and defendants stipulate to the following chronology of facts:

1.    Richard B. Maltas was born on February 15, 1918.

2.    February 18, 1942, Mr. Maltas married Virginia Tallon.

3.    Mr. and Mrs. Maltas had seven children: Richard Brian ("Brian"); Virginia, John Thomas ("Tom"), George, Michael, Jeanne and Patrice.

4.    Mrs. Maltas suffered a stroke, lapsed into a coma and died on May 21, 1991.

5. The house in which Mr. and Mrs. Maltas resided was sold in the fall of 1991.

6. In the fall of 1991, Mr. Maltas transferred $100,000.00 to Michael and Mary Ellen.

7. In November 1991, Michael and Mary Ellen purchased a residence at 1 Sylvan Drive, Ridgefield, Connecticut.

8. In January 1992, subsequent to the transfer of $100,000.00 from Mr. Maltas and two months after Michael and Mary Ellen purchased the Connecticut residence, Michael and Mary Ellen granted a Quit Claim Deed to Mr. Maltas.

9. Mr. Maltas, Michael, Mary Ellen and the three children of Michael and Mary Ellen moved into the Connecticut residence in November 1991.

10. In 1993 Michael Maltas contacted James M. Mannion and Mr. Mannion drafted a new Quit Claim Deed as part of the refinancing of the Connecticut residence.

11. At the time of the 1993 refinancing of the Connecticut residence, Michael and Mary Ellen received $10,381.11 in cash back from the transaction.

12. In September, 1996, Michael took a job in Washington, DC. Mary Ellen and their children continued to live in Connecticut until mid-June 1997. The Connecticut residence was leased to tenant #1 from mid-June 1997 to January 1998; to tenant #2 from March 1998 to early April 1999, when he was evicted.

13. Michael and Mary Ellen decided to sell the Connecticut residence in 1999.

        The closing of the sale of the Connecticut residence occurred on July 30, 1999. The sale price was $249,000.00 and Michael and Mary Ellen received $87,036.70 after the mortgage, commissions and fees were paid.

14.    Michael and Mary Ellen used $60,440.47 from the proceeds of the Connecticut residence to purchase a residence in Riva, Maryland. The money from the sale of the Connecticut residence that was not used by Michael and Mary Ellen for the purchase of their Maryland residence was used by Michael and Mary Ellen for their own purposes.

## G. DETAILS OF DAMAGES CLAIMED BY THE ESTATE OF RICHARD B. MALTAS

The Estate claims that it is entitled to a refund of the $100,000.00 transferred to Michael and Mary Ellen minus the fair market value of Mr. Maltas' non-exclusive use of the basement of the Connecticut residence. Alternatively, the Estate claims that it is entitled to a refund of the $25,000.00 transferred to Michael and Mary Ellen for the addition that was never built. The Estate also claims that it is entitled to of Mr. Maltas' share of the rental proceeds from the leasing of the Connecticut residence for two years. The Estate further claims damages in the amount of interest or investment return that a prudent investor would have received on the amounts to which it is entitled from 1991 to the present. Further, the Estate requests an accounting of the present value of Mr. Maltas' interest in the Riva, Maryland residence. Finally, the Estate seeks that the Court impose a constructive trust of 43.2% of the Maryland residence for the benefit of the Estate.

H.  **EXHIBITS TO BE OFFERED**

The Estate of Richard B. Maltas will offer the following documents and exhibits in his case in chief:

1. 3/28/00 Biography of Ben Maltas
2. Documents written by Mr. Maltas 1994-2000
3. 1992 Quit Claim Deed (executed and unexecuted)
4. 1993 Quit Claim Deed
5. Letters written by Ben Maltas 1999-2000
6. Letter from Mr. Mannion to Michael Maltas
7. First and second leases on Sylvan Drive property
8. Letter from Mr. Maltas (Joint appendix exhibit 10)
9. Letter from Mr. Maltas to Michael Maltas
10. Letter from Mr. Mannion to Mr. Maltas
11. Appraisal of Sylvan Drive property
12. Closing Statement Sylvan Drive property
13. Settlement Statement Stonehenge Drive property
14. Michael and Mary Ellen's refinancing documents
15. Richard B. Maltas' Alaskan Longevity bonus records
16. Richard B. Maltas' Alaskan Permanent Fund records
17. Richard B. Maltas' Alaskan Motor Vehicle records
18. Richard B. Maltas' Letter Printed by the Daily News

In addition to those being offered by the Plaintiff, the Defendants intend to offer the following exhibits:

1.  Documentation showing the net proceeds paid to Ben as a result of the sale of the family home after Virginia died in 1991.

2.  Letter from Angeline B. Francoletti (James M. Mannion's office) to Ben, c/o Brian Maltas, dated November 4, 1991, enclosing the Decree from the Redding Probate Court and advising Ben that he could close out the Greenwood Bank of Bethel account on Virginia's estate.

3.  Letter from James M. Mannion to Ben dated December 12, 1991, enclosing a draft of the proposed 1992 Quit Claim Deed.  [This may be in your list. Joint Record Extract A.193.]

4.  Letter from James M. Mannion to Michael L. Maltas dated February 9, 1994, enclosing the recorded 1993 Quit Claim Deed.  [This may be in your list.  Joint Record Extract A.501.]

5.  Listing for 1 Sylvan Drive, Ridgefield, Connecticut.

6.  Letter from Ben dated October 1, 1996.  (Joint Record Extract A.192.]

7.  First and Second Leases on Sylvan Drive property.

8.  Correspondence from attorneys in 1999 to Mr. & Mrs. Maltas regarding the efforts and expenses in evicting the tenants from the Sylvan Drive property.

I.  **WITNESSES TO BE CALLED**

Plaintiff will call the following persons as witnesses at trial:

1.  Brian Maltas

2.  James Mannion

3.  LeRoy Eugene DeVeaux

4.  Marilyn Maltas

5. Michael Maltas

6. Mary Ellen Maltas

7. John Maltas

8. Gracie Mahoney

9. Rich Maltas

10. Patrice Maltas

11. Jeanne Maltas Piro

Defendant will call the following witnesses at trial:

1. Michael Maltas

2. Mary Ellen Maltas

3. Gary Chontos

**J.     EXPERT WITNESSES**

Plaintiff will call LeRoy Eugene DeVeaux as a fact witness, but he may also give testimony regarding the Alaska Permanent Fund and Alaska Longevity Bonus.

**K.     DEPOSITION DESIGNATIONS**

Plaintiff and defendants do not intend to offer any portions of a deposition in their case in chief. Plaintiff is attempting to subpoena James M. Mannion to testify at trial, if his attendance is unable to be secured, plaintiff will introduce portions of his deposition.

**L.     ANY OTHER PRETRIAL RELIEF REQUESTED**

1. Dead Man's Statute Objections

As per the Court's summary judgment ruling, Tom, as personal representative of Ben's estate, would be barred from testifying about conversations he had with Ben. However, if Tom does not offer such evidence, there is no objection to other

testimony he may offer as to Ben's competency, except as to its relevancy to determining Ben's state of mind in 1991. The plaintiff does not concede the correctness of the Court's ruling with respect to the Dead Man's Statute and should defendants object to any trial testimony that the plaintiff attempts to elicit, the plaintiff intends to preserve for appeal its objection to the Court's ruling.

2.     Motion in Limine regarding allegations of drug use.

For the first time, the Plaintiff has raised the possibility that alleged drug and alcohol use or abuse was responsible for the expenditure of the funds left over from the $100,000.00 given by Ben to the Defendants. *See*, footnote 4 to the proposed pretrial order. The Defendants vigorously deny this allegation. Discovery was extensive in this case, and no one made any such claim at any time while this case was being prosecuted through the legal system. To raise such an allegation at this time, without any evidence or discovery, is clearly improper. Furthermore, such allegations would be highly prejudicial to the Defendants who have been hard-working good parents throughout a strong marriage. Michael has been employed continuously by CBS and CNN since before the events in 1991, working nights and weekends, and would not have had such a responsible career if he and/or his wife, Mary Ellen, were drug-users. The Defendants plan to file a Motion in Limine as to such accusations if the Plaintiff continues to pursue such allegations. As of Tuesday, November 04, 2003, the Plaintiff has not decided whether to pursue such allegations.

**M.     OTHER MATTERS ADDED BY THE COURT**

                                  /s/
H. Mark Stichel
Federal Bar No. 02939
Benjamin D. Hinceman
Federal Bar No. 26876
Gohn, Hankey & Stichel, LLP
201 North Charles Street, Suite 2101
Baltimore, Maryland 21201
410-752-1658
Attorney for the Estate of Richard B. Maltas, Plaintiff


                                  /s/
Douglas C. Hollmann
Suite 220
60 West Street
Annapolis, Maryland 21401

Attorney for Michael and Mary Ellen Maltas, Defendants